JUENGST v. GULLBERG et al.

(Circuit Court of Appeals, Second Circuit. March 7, 1910. Ordering Reargument, March 30, 1910. On Rehearing, May 2, 1910.)

No. 120.

PATENTS (§ 328*)—INFRINGEMENT—SIGNATURE-GATHERING MACHINE.

The Juengst patent, No. 761,496, for a signature-gathering machine, claim 1, was not anticipated, but covers a novel and patentable improvement on the machines of the prior art, and is entitled to a fair range of equivalents; also, *held* infringed. Claim 19 *held* invalid as a substantial duplication of claim 1, and the remaining claims not infringed.

Appeal from the Circuit Court of the United States for the Southern District of New York.

———

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Suit in equity by Charles A. Juengst against Alexander Gullberg and Charles L. Smith, as copartners. Decree for defendants, and complainant appeals. Reversed.

This cause comes here on appeal from a decree of the Circuit Court, Southern District of New York, dismissing the bill. The suit was brought for alleged infringement of letters patent No. 761,496 issued May 31, 1904, to Charles A. Juengst for a signature-gathering machine. The opinion of the Circuit Court will be found in 171 Fed. 428. The following excerpt therefrom succinctly describes the art.

"Printed sheets, as they come from a printing machine, are usually folded once or more. These folded sheets are known to the trade as signatures. They may be in pamphlets or simply sheets. They are gathered to form a book or magazine. A signature-gathering machine takes these several sheets or pamphlets automatically and assembles them for the book or magazine. As these sheets or pamphlets called signatures are frequently imperfect, by leaves being missing or too many present, it is essential that the machine be so constructed that it shall gather only perfect signatures, and that imperfect signatures may be detected in such a manner that the error may be readily corrected. The machine must be adjusted for a pre-determined thickness of the signatures, and, if there is a deviation from that, it must be detected."

Ralph L. Scott (F. B. Brock, of counsel), for appellant.

W. E. Warland (William J. Wallace, of counsel), for appellees.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above). The patent states that the object of the invention is to detect signatures or sheets which for any reason are imperfect, reversed, or are variations from the predetermined thickness, and to immediately act upon devices to stop the machine, so that the same may be removed or rectified. According to the specifications the

—"invention comprises in a signature-gatherer and in combination with a stopping and starting mechanism and a signature-gripper of any well-known or desired character, a device intermediate of said devices, which is actuated and controlled by the latter or signature-gripper device and which exercises a control upon the former device—that is, the device for stopping and starting the machine—whereby variations from the predetermined thickness of the signature or sheet act upon the aforesaid intermediate device for their detection and stopping the machine. I prefer that this intermediate device shall be in the form of adjustable plates mounted upon an arm that is adapted to be moved into contact with the stopping and starting mechanism and that an arm and finger moved by the gripper device shall move over the surface of these plates and pass through a regulatable aperture between the same, providing the sheets and signatures agree in thickness, and in case they do not agree and are too thick or too thin this finger shall stop on the surface of said plates and with the further movement of the gripper stop the machine, and in connection with these devices I employ means for adjusting the closed relation of the gripper-jaws in proportion to the thickness of the signature or sheet, this adjustment acting to control the position of the aforesaid finger, so that it will truly pass through the aperture between said adjustable plates."

In considering the prior art, the Circuit Court referred to certain "signature-gathering machines on the market involving the same principles." We are not satisfied from the evidence that these were prior to the date of invention, which was proved to be several months prior to the filing of the application. In neither such machines nor in

the prior art disclosed in patents and publications did the Circuit Court find anticipation and it held the patent to be valid, in which conclusion we concur. The only subject which need be discussed is the question of infringement.

The claims are unnecessarily numerous, 20 in all, of which Nos. 1, 2, 3, 5, 6, 7, 8, 9, 12, 13, 14, 15, and 20 are involved. It will be sufficient to quote the first three, since the others are as detailed as are Nos. 2 and 3, some of them more so:

"1. In a signature-gatherer, the combination with a stopping and starting mechanism and a signature-gripper, of an adjustable device intermediate of said mechanism and gripper and actuated and controlled by the gripper and exercising a control on the said mechanism, whereby variations from the predetermined thickness of the signatures or sheets act upon the intermediate device for their detection and stop the machine.

"2. In a signature-gatherer, the combination with a stopping and starting mechanism, and a signature-gripper, of means for adjusting the closed relation of the gripper-jaws in proportion to the thickness of the signature or sheet, a device intermediate of the stopping and starting mechanism and gripper, actuated and controlled by the latter and exercising a control on the former device, whereby variations from the predetermined thickness of the signature or sheet act·upon the intermediate device for their detection and stop the machine.

"3. In a signature-gatherer, the combination with a stopping and starting mechanism and a signature-gripper, of means for adjusting the closed relation of the gripper-jaws in proportion to the thickness of the signature or sheet, a part. movable with the gripper, a lever having a part adjustable and co-acting with said movable part, and which parts are intermediate of the stopping and starting mechanism and gripper, whereby variations from the predetermined thickness of the signatures or sheets act upon the part movable with the gripping to shift the position of the same and cause the engagement thereof with the adjustable part of the lever to swing the same and stop the machine."

The patent shows a grip-lever, D, which swings towards a pile of signatures, and, after it has seized one of them, swings back to a carrier on which the signature is dropped, whereupon the grip-lever moves forward again. So much is old and the defendant also uses a swinging grip-lever. Both levers have gripping jaws at the lower end which open to receive the signature, close on it, and subsequently open to let it fall on the carrier. In the machine of the patent the upper jaw is rigid and the lower jaw moves. The reverse is the case in the defendant's machine, which is an immaterial difference, involving no change of function. It is apparent that, when the jaws are closed on two sheets of paper, they have come closer together than when they are closed on four sheets. The movable jaw being a lever, it is also apparent that, if the gripping end of it varies in position when it has gripped varying thicknesses of paper, the other end of the same lever will also vary in position, and so will whatever part is attached to such end. At this further end of complainant's lever is a rod, D3, D4, which runs upward a considerable distance and has a short arm, D30, and a long arm, D15, nearly at right angles with the rod. This rod is pivoted on a projection of the gripper-lever in such a way as to permit motion of both the short arm and the rod and long arm on the pivot. The rod, pivot, and arms move as the gripper-lever swings and also move on their own pivot. Without going into·

elaborate details of the mechanism, it may be stated that, when the gripper-lever has moved in and the signature is between the open jaws, an auxiliary shaft, F, through connecting parts pulls up the short arm, D30, which depresses the rod, D3, D4, and makes the lower jaw close on the signature. The gripper-lever and all parts then move out, and, when in proper position, a further movement of the auxiliary shaft, F, through connecting parts, depresses the short arm which causes the rod, D3, D4, to rise and the lower jaw to open. The long arm, D15, is the detector arm provided with a finger or projection at its extremity. It is rigidly connected with the rod. Since the rod is connected to one end of the pivoted movable jaw, its position in space when the jaws are closed will be influenced by the thickness of the package of paper on which the movable jaw has closed, and that influence is also felt in the detector arm. By reason of the location of pivots and proportion of parts, changes of position in the gripping end of the jaw are exaggerated at the end of the detector arm. A unit of displacement in space at one end of the chain of mechanism becomes many units at the other end. Therefore such a slight difference as would be caused at the jaws by the absence of a single sheet from a signature of 16 sheets is sufficiently increased at the finger of the long arm to allow it to be utilized as a detector of such absence. This is accomplished by interposing the stopping and signaling mechanism in the orbit which the detector arm follows, as it moves in and out with the swing of the gripper-lever and up and down with the rod under the action of the auxiliary shaft, and then opening a pathway through the interposed parts of such stopping and signaling mechanism, which the detector finger may travel unobstructed when its movement in space is such as it will follow when the predetermined number of sheets are gripped. This opening, however, is so circumscribed that if, by reason of an abnormal number of sheets affecting the position of the movable jaw, the detector finger travels in an abnormal orbit, it will contact with one or other side of the pathway, and operate the stopping and signaling mechanism. This is accomplished by gauge-plates, B3, B4, on a prolongation of a swinging lever, B, which connects with the stopping devices. These gauge-plates, the specification says, "are adjustable towards and from one another by (screws) to increase or lessen the diameter of the aperture or slot through which the gauge-finger (detector finger) is adapted to pass."

This device, the detector arm and finger in co-operation with the movable gauge-plates, is the invention of the patent (see first quotation supra). It is the device, intermediate the stopping and starting mechanism and the signature-gripper, "which is actuated and controlled by the latter or signature-gripper and which exercises a control upon the former device—that is, the device for stopping and starting the machine." The specification, as it seems to us, goes into entirely unnecessary details as to those other mechanisms, which the patentee nowhere asserts to be his invention. In consequence it is difficult to eliminate the essentials from the nonessentials, and one is likely to be misled by differences between parts of the described machines of complainant and defendant which in reality have nothing to do with the device claimed.

Defendant's entire machine differs in many respects as to parts and arrangements from the entire machine described in the specifications. The stopping mechanism is hung upon a separate shaft. The opening and closing of the jaws is effected not by a rod, but by a toggle and spring which are operated by a sliding pin in the gripper-lever. It is not necessary to recount all the differences, since we are concerned only with so much of the device as deals with the detector arm. Attached to the swinging gripper-lever of defendant is a pivoted arm, one end of which is connected by a rod, D3, D4, with the outer end of the movable jaw (the upper jaw in defendant's machine). At the other end of the arm is a projection or finger which describes an orbit as the gripper-lever swings and the jaws open and close. In the path of this moving finger is located a prolongation of the stopping mechanism, presenting an opening through which it moves under normal conditions, but which opening may be regulated as to size and location by adjustable dogs. Through the action of the movable jaw and of the rod, D3, D4, the position in space of the finger, or detector, is changed as the thickness of the package of paper changes, and by reason of the proportion and position of the parts the difference is exaggerated so that the dogs may be easily adjusted to bring the stopping mechanism into operation by intercepting the moving finger when it follows an abnormal orbit. This device seems to us to be a fair equivalent of the detector mechanism of the patent; it effects the same function by the operation of similar parts similarly arranged.

By reference, however, to the first quotation, it will be seen that the patentee in connection with his device employs means for adjusting the closed relation of the gripper-jaws in proportion to the thickness of the signature, this adjustment acting to control the position of the finger, so that it will truly pass through the aperture between the adjustable plates. This "means for adjusting the closed relation of the gripper-jaws" is found in the rod, D3, D4. This is a two-part straight rod. The lower part of D4 is inserted into the upper part of D3, and by means of screw-threads, a screw-cap, hooks, etc., the combined lengths of the two parts of the rod can be altered easily and with great nicety "to adjust the grippers for signature or paper of different thicknesses." There is much conflicting testimony as to this part of the machine, but we are satisfied that this adjustment is essential to the efficiency of the gripper-jaws, and that in this respect there is a difference between the two machines. Farther along in the train of mechanism which operates the jaws of the patented device there is a spring, D21, and we were at first impressed with the contention of complainant's expert that in it was to be found the operative force which closed the jaws. More careful study of the device, however, has satisfied us that, although it may take up a bit of lost motion, the opening and closing of the jaws are both effected by the unvarying sequence of movements of the auxiliary shaft, and, unless the length of the rod, D3, D4, is adjusted, as the specification says, "for signatures of different thicknesses," the jaws will not close sufficiently to be perfectly efficient. The defendants' jaw-closing device—the toggle and spring—seems capable of effecting a full closing, metal to metal, without so much adjustment. The testimony supports this conclu-

sion. Defendants' rod, D3, D4, is made of two parts with turn-buckles, an arrangement which they contend is a mere shop expedient to cheapen original construction. Since infringement was charged these turn-buckles have been riveted in place so that the user can no longer by adjustment alter the length of the rod, and with this change the jaws operate perfectly with every change of thickness of signature, closing metal to metal when there is no signature between them. We therefore find that defendants' rod, D3, D4, is not an infringement of complainant's rod, D3, D4. The result is that there is no infringement of any claim in which the rod, D3, D4, is made an element as "means for adjusting the closed relation of the gripper-jaws in proportion to the thickness of the signature or sheet." This eliminates every claim except the first.

The length of the rod, D3, D4, affects the position in space of the detector finger, and defendant contends that the patent must be restricted to an adjustment of that finger by the screw-cap arrangements which regulate the length of the rod. But the specification does not so state. It asserts that the operation of the finger in making clearance or encountering obstacles is effected by the shifting of the gauge-plates, on the arm, B, which as we have seen is the equivalent of the adjustment of dogs, B3, B4, of defendants' device. The regulation of the length of the rod may be essential to the efficiency of the gripper-jaws, but it is not essential to the clearance or contact of the detector finger with parts of the stopping mechanism. Claim 1 is confined to the adjustable device intermediate the gripper mechanism and the stopping mechanism. It presupposes an efficient gripper-mechanism and an efficient stopping mechanism. The patent discloses such mechanisms, both efficient. The defendant by using a mechanism to make the gripping efficient which differs from complainant's does not escape this claim, so long as the "adjustable intermediate device" is the equivalent of the "adjustable intermediate device of the patent," which we are satisfied that it is.

The decree is reversed and cause remanded, with instructions to enter a decree in favor of complainant for infringement of claim 1 only. Since neither side has prevailed as to all the claims involved, no costs to either side.

## Ordering Reargument.

PER CURIAM. A reargument is ordered on the single question whether the prior art negatives invention under claims 1 and 19 as this court has construed them. The argument must be strictly confined to this single question, and one-half hour will be allowed to each side. The briefs filed on main argument may be used, or new ones if the parties prefer.

## On Rehearing.

LACOMBE, Circuit Judge. Decision was rendered and opinion on this appeal handed down March 7, 1910. As to all the claims involved except the first (and the nineteenth, which by some oversight we sup-

posed was not presented on the appeal), we held with the Circuit Court that infringement was not shown, because all of them include as one element of the combination "means for adjusting the closed relation of the gripper-jaws in proportion to the thickness of the signature or sheet." We held that this element was not included in the first claim, and that the combination of that claim was infringed by defendant's device. The oral argument on the appeal had been almost entirely directed to this element, to the necessity of its presence in the patented device and to its absence in defendant's structure. The mechanism of the patent in suit and of those in the prior art is intricate and the description thereof voluminous and involved. Our decision was not handed down until several weeks after the argument. Therefore, when defendant petitioned for a reargument as to the validity of this claim, we thought it best to grant the application, restricting the argument, however, to the single proposition whether, construing the first claim as we construed it, the prior art would warrant the court in holding that it disclosed patentable novelty. Having heard argument, we have reached the conclusion hereinafter expressed.

Counsel for defendant seems to have misunderstood the scope of our former decision. We did not hold that the claim covered any and every mechanism intermediate the stopping and starting mechanism and the signature-gripper, which accomplishes the results. Such a broad construction was not intended, nor, as we think, was it expressed in the opinion. Under familiar principles, the device claimed must be the device disclosed by Juengst or its substantial equivalent. It is not necessary to repeat the elaborate description of complainant's device which is found in the opinion—that device or one substantially the same, allowing for fair equivalents of parts of the mechanism, is the "adjustable device intermediate, etc.," which must be shown in any device complained of before infringement can be proved. Neither is it necessary to repeat the detailed discussion of defendant's mechanism in which we pointed out wherein it was substantially the device of the patent. Our views on these points remain unchanged. We did not hold that this was a pioneer patent, but were satisfied that it disclosed a meritorious improvement on earlier machines, entitling the patentee to a fair range of equivalents. Whether or not we were correct in holding that it did disclose a meritorious improvement is the question now to be considered, and we will proceed at once to the patents of the prior art.

La Sor No. 665,789 is for a book signature-gatherer. The device for detecting a failure of the gripper-jaws to act normally and thereupon to stop the machine is thus described in the specifications:

"To provide against the assembling of an incomplete book, the clutch-operating devices above described are provided. Should any pair of the gripper-jaws fail to grip a book-section in one of the compartments, the contact buttons, 114 and 114a, thereof will coengage [there being no insulating sheets of paper between them], closing an electrical circuit through the respective branch wires, 116 and 117, the circuit-wires, 108 and 109, and the electromagnet, 102, causing the armature, 103, thereof to free the trigger-dog, 105, from the catch-head, 102a, and lowering the arm, 99, which operates the clutch 95

to operatively disconnect the operative parts of the machine from the power-shaft 10."

This is certainly very remote from anything Juengst has shown or claimed.

Dexter 567,303 is for a stop mechanism for printing presses. The specification says:

"To prevent the paper from entering the printing-press in case two or more sheets are accidéntally fed simultaneously from the feeding machine I employ an automatic auxiliary stop mechanism for throwing the press out of gear. This preferably accomplished on a two-revolution press by the following mechanism. [The details need not be repeated. The mode of action sufficiently discloses the essentials of the device.] The free end of the finger is supported above the feedboard a distance exactly equal to the thickness of a single sheet of paper designed to be fed to the printing press. By the adjustment of the set-screw the finger, m, can be regulated to the varying thickness of different qualities of paper. * * * The finger m constitutes one of the electric terminals and over the same is adjusted the other terminal, o, * * * so adjusted as to cause the finger m to come in contact therewith and thus close the circuit by the lifting of said finger by two sheets of paper passing simultaneously under the finger. Said circuit maker and breaker is connected with the magnet, N, and battery, E. By closing this circuit [a pawl is brought in contact with a lever, which is turned on its pivot so as to shift the driving belt to the loose pulley]."

Dexter describes other mechanisms differing somewhat from what he says is preferable for a two revolution press, but in all of them the circuit makers and breakers and the electromagnet are the essentials of his automatic stop mechanism. No such device as this, if later, could be held to be an infringement of the "intermediate device" which Juengst has shown and claimed.

Dexter 588,635 is for a "collating" or signature-gathering machine. The signatures are taken from the hopper not by a swinging gripper lever, but by a pair of rollers, B, B. The signatures, as in most of these machines, are sucked from the pile on the hopper by the nozzles of a suction pipe, and fed forward to the rollers, to which they are presented perpendicularly. The description is voluminous and the mechanism intricate. Reference is made to the following passage from the specifications:

"The salient features, however, of the invention reside in the mechanisms employed for automatically controlling the action of the described signature delivering and gathering devices, so that in case said devices fail to deliver simultaneously a single signature from each hopper, A, or deliver more than one signature at a time from one or more hoppers, the delivering devices adjust themselves to prevent the delivered signatures from passing onto the gathering-carrier, H, and as soon as the delivering devices have resumed their proper requisite operation to deliver from each hopper, A, a single signature, said devices cause the signature to be conducted to the gathering-carrier. For this purpose I employ the laterally-yielding rollers, B, B, which act as normally-closed calipers opened automatically by the pressure of the signature passing through said calipers, and thus measuring the thickness of the signature in transit. In connection with these laterally-yielding rollers or calipers I employ suitable levers which are actuated by the lateral movement of said rollers or calipers and control the position of the chutes, f', f', and the motion of the gathering-carrier, H, so as to operate in harmony."

We shall not undertake to quote the elaborate description given in the patent, but inserting small sections of Figs. 1 and 2 will endeavor briefly to indicate the fundamental character of the device.

FIG. 1.

FIG. 2.

Looking at figure 1, B, B, are the rollers to which the signatures are fed, passing vertically downward between the guides, f, f. Beneath these guides is a two-way chute, f', f', on one or the other slope

of which the signature will slide. When the chute is in the position shown in figure 1, the signature will pass on to the carrier, H. When it is in the position shown in figure 2, the signatures are shunted off—to the floor or somewhere else. The rollers are movable laterally through their supports, B', B', against the action of springs, c, c; the spring on one side being stronger than that on the other. Through a chain of mechanism which will be seen in the drawings but need not be described, the chute is shifted from one position to the other by tilting the post, f", which supports it. This chain of mechanism receives its impulse from the movement of one of the roller supports, B', against the bell-crank lever, k, or from the movement of the other roller support, B', against the bell-crank lever, m'. When the rollers, B, B, are normally in position with no signature between them, the post is tilted so as to put the chute in the position shown in figure 2. When a single signature comes between the rollers support, B,' is forced against the weaker spring moving one of the bell-crank levers and tilting the post so as to bring the chute into the position shown in figure 1—conducting signatures to the carrier, H. When two signatures, by some mischance, come between the rollers, their excessive thickness pushes aside the roller support against the stiffer spring and through the appropriate bell-crank lever and connecting parts tilts the post so as to bring the chute into the position shown in figure 2.

In this machine a change of position of the parts which grip the signatures produces a corresponding change of position of another part at the end of a train of mechanism, but the intermediate devices are differently arranged from those of Juengst and because of the different arrangement produce less comprehensive results. Dexter's device provides for the detection merely of a double delivery or of a total failure to deliver. It is not organized to reveal so slight an error as the presentation of signatures with a single sheet missing, while reversed signatures, being presented by the suction nozzles in a plane perpendicular to the bite of the rollers, would apparently be passed on as perfect signatures properly placed.

The Jamieson British patent, 13,850, of 1886, shows signatures fed forward out of a series of boxes upon a traveling table. The specification says:

"As the missing of a section would affect the efficient working of the machine, a small lever is provided in such a position in front of each box that as a section is drawn out it causes the lever to be pushed back and by so doing rotates a bar running the whole length of the machine, which, if not completely or correctly rotated (by reason of one particular gripper failing to catch the section and coming away from the box empty) fails to allow another rod to rotate. A releasing device is then brought into operation that disconnects the moving parts of the machine from the driving pulley thereby stopping the machine until the attendant supplies (by hand) the missing section."

This is quite remote from the intermediate mechanism of the patent both in organization and in function.

Heywood, No. 590,984, is for a stop-motion mechanism to "control the movements of machines for various purposes." It is described and illustrated in connection with an envelope machine. Immediately below the paper blank is a set-screw which is adjusted to contact with the blank, immediately above is a vertical threaded shaft on which there

is a disk with a slot cut in it. Through the free space left by this slot a stop-finger passes, as it rocks up and down when the vertical shaft descends so as to touch the upper surface of the paper blank. But if there is no paper blank, or if there are two, the vertical shaft will descend lower, or not so low (as the case may be) and in consequence the disk will be rotated too far, or not far enough, to present the slot to the stop-finger, which thereupon impinges on the disk and stops the machine. This is very similar to Juengst's detector finger and adjustable portal—indeed, there is nothing about this particular stop device, the interposing of an obstruction in a path normally free, which is broadly novel. But the general arrangement of connecting mechanism between the paper in the gripper-jaws and the detecting device actuated by such mechanism, which is found in complainant's and defendant's machines, is not in Heywood.

The Schofield and Baker patent, No. 135,598, for feeding paper to a printing press, with its spur or needle, z, for penetrating the sheet or sheets fed forward, need not be described. Neither it nor any of the other patents referred to are any closer to Juengst's device than those which have been discussed.

Defendant contends that the novelty of the first claim is conclusively negatived by the action of the Patent Office. That claim reads as follows:

"1. In a signature-gatherer the combination with a stopping and starting mechanism and a signature-gripper of an adjustable device intermediate of said mechanism and gripper, and actuated and controlled by the gripper, and exercising a control on the said mechanism, whereby variations from the predetermined thickness of the signatures or sheets act upon the intermediate device for their detection and stop the machine."

It was before the examiner exactly as it stands now (save for some immaterial verbal changes) except that it did not contain the word "adjustable" applied to the intermediate device. It was rejected on the patents to Dexter and La Sor. Thereupon the applicant inserted the word "adjustable," and it was allowed. The insertion was a proper one because the intermediate device shown was really adjustable by shifting the position of the gauge-plates on the arm, B (see our former opinion), so that the same machine could handle signatures of 2, 4, 6, 8, or even more sheets. But we are not satisfied from the proofs that the office allowed the patent solely because this element of adjustability was incorporated in the claim, and that it would otherwise have rejected it. The letter which inclosed the amendments refers to a personal conference with the examiner at which interview the reference patents were discussed. We cannot say that such discussion did not convince the examiner, as a study of the prior art has convinced us, that Juengst's device was novel irrespective of its feature of adjustability for signatures of different thicknesses.

As to claim 19 which was overlooked in our former opinion, it differs from claim 1 only in the statement that the jaws of the gripper come at opposite sides of the signature. But jaws that grip necessarily come at opposite sides of what they grip. Claim 19 is therefore a mere duplication of claim 1 and should be thrown out.

The conclusion expressed in the original opinion is reaffirmed.